1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                      EASTERN DISTRICT OF CALIFORNIA

10

11    ERICK EDDIE RODRIGUEZ,                 Case No.: 1:21-cv-00898-KES-SKO (PC)

12               Plaintiff,                  **FINDINGS AND RECOMMENDATIONS
                                             TO GRANT DEFENDANTS' MOTION
13         v.                                FOR SUMMARY JUDGMENT**

14    M. CATE, et al.,                       **14-DAY OBJECTION PERIOD**

15               Defendants.

16

17         Plaintiff Erick Eddie Rodriguez is a state prisoner proceeding pro se in this civil rights

18    action pursuant to 42 U.S.C. § 1983.

19         **I.     INTRODUCTION**

20         On May 17, 2024, Defendants filed a Motion for Summary Judgment. (Doc. 53.) The

21    motion included a *Rand*[1] warning to Plaintiff. (Doc. 53-1.) Plaintiff did not file an opposition to

22    Defendants' motion and the time to do so has passed.

23         **II.    PLAINTIFF'S CLAIMS**

24         Plaintiff contends he was exposed to hazardous toxic substances while incarcerated at

25    Kern Valley State Prison (KVSP) from 2010 to 2012 and was diagnosed with

26    "Dermatofibrosacoma Proberans (DFSP) in 2018." He alleges DFSP is a rare form of cancer

27    _____

28    [1] *Rand v. Rowland*, 154 F.3d 952, 962-63 (9th Cir. 1998).

1    associated with arsenic exposure. He further contends he was "exposed to arsenic water, and

2    forced to drink" that water at KVSP. Plaintiff asserts KVSP was non-compliant with "U.S.E.P.A.

3    regulation standards" during his incarceration at KVSP. Plaintiff states: "Notification protocol

4    failed to inform of major risk factors of arsenic in lung, and skin cancer," and that arsenic is a

5    "class 1 human carcinogen with long term effects …." Plaintiff contends arsenic "levels remained

6    in U.S.E.P.A. regulatory violation during notification, and continued to be at maximum

7    permissible under federal standard" during his incarceration at KVSP from 2010 through 2012.

8    Plaintiff alleges Defendants were aware of the risks presented and failed to take action to alleviate

9    the risks.  Plaintiff contends his injuries include skin cancer; joint, kidney and organ pain; skin

10   lesions; "abnormal" anxiety; psychological disorder; mental distress; and unnatural thoughts and

11   feelings.

12          Following screening of the complaint, the Court found Plaintiff plausibly alleged Eighth

13   Amendment conditions of confinement claims against Defendants Cate and Biter. Plaintiff

14   established the first objective prong of the deliberate indifference test by alleging the arsenic to

15   which he was exposed via the drinking water at KVSP is the cause of his DFSP, a sufficiently

16   serious deprivation. Plaintiff also established the second subjective prong of the test by plausibly

17   alleging that Defendants Cate and Biter were aware of the risk presented and disregarded the

18   excessive risk to Plaintiff's health and safety.

19          **III.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

20          Defendants Cate and Biter assert they were not deliberately indifferent to the non-

21   dangerous levels of arsenic in KVSP's water. (Doc. 53-1 at 6-7.) Specifically, Defendants

22   contend KVSP's water did not objectively present a substantial risk of serious harm to Plaintiff

23   (*id*. at 7-9), and Plaintiff cannot show that Defendants were subjectively indifferent to a serious

24   risk of harm related to KVSP's water (*id*. at 9-11). Defendants also contend they are entitled to

25   qualified immunity. (*Id*. at 11-14.)

26   //

27   //

28
                                                  2

1        **IV.**    **DEFENDANTS' STATEMENT OF UNDISPUTED FACTS[2]**

2        1.     Plaintiff Erick Eddie Rodriguez is a former inmate in the custody of the California

3 Department of Corrections and Rehabilitation (CDCR).

4        2.     Plaintiff was incarcerated at KVSP from July 8, 2010, to May 2, 2012.

5        3.     Defendant Cate was employed as the Secretary of CDCR from May 16, 2008, to

6 November 2012.

7        4.     Defendant Biter became KVSP's Acting Warden in August 2019, and was named

8 Warden in February 2013. He held this position until November 2015.

9        5.     In 2001, the United States Environmental Protection Agency (U.S. EPA) updated

10 its maximum contaminant level (MCL) for drinking water to 10 parts per billion (0.010 mg/L) of

11 arsenic from 50 parts per billion (0.050 mg/L). This standard did not become effective until 2006.

12        6.     This was a significant reduction as it is impossible to find drinking water in the

13 environment free of arsenic.

14        7.     The State of California adopted the U.S. EPA's new arsenic MCL standard in

15 November 2008.

16        8.     As of July 6, 2010, 1,375 of the 10, 425 wells sampled in California had arsenic

17 concentrations above the federal MCL. Kern County is one of the counties with the most wells

18 above the arsenic MCL.

19        9.     KVSP has two wells that provide drinking water for the entire prison, which

20 provide the same water to inmates and staff.

21        10.    Between July 2010 and July 2012, KVSP's arsenic level was less than half the

22 former MCL, with quarterly averages for its two wells between approximately 0.014 mg/L and

23 0.020 mg/L.

24        11.    As Acting Warden and Warden, Warden Biter posted quarterly notices reporting

25

[2] Because Plaintiff did not file an opposition, he neither admitted or denied the facts set forth by defendant
26 as undisputed nor filed a separate statement of disputed facts. Local Rule 260(b). A verified complaint in a
pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule,
27 where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely
on the inmate's belief. *McElyea v. Babbitt*, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); *Lew v.*
28 *Kona Hospital*, 754 F.2d 1420, 1423 (9th Cir. 1985); Fed. R. Civ. P. 56(e).

the levels of arsenic in KVSP's drinking water. The notices conformed with the ones the

California Department of Public Health required KVSP to post.

12.    The quarterly notices states that the arsenic levels at KVSP did not present an

emergency.

13.    The quarterly notices stated that the inmates did not need to use an alternative

water source.

14.    The quarterly notices did not state that KVSP's specific arsenic concentrations

were high enough to cause illness.

15.    While Warden Biter was KVSP's Acting Warden and Warden, KVSP and Warden

Biter provided annual consumer confidence reports about KVSP's water to staff and inmates.

16.    While Warden Biter was KVSP's Acting Warden and Warden, KVSP and Warden

Biter tested KVSP's drinking water for contaminants and provided the results to the California

Department of Public Health.

17.    Arsenic poisoning is generally in one of two forms: acute arsenic poisoning and

chronic arsenic poisoning. Generally, acute arsenic poisoning results from exposure to high

concentrations of arsenic over a short period of time, while chronic arsenic poisoning results from

exposure to low concentrations of arsenic over a long period of time.

18.    Acute arsenic poisoning causes severe gastrointestinal illness, with nausea,

vomiting, abdominal pain, and diarrhea. This is followed by a variety of hematological effects

(blood diseases), neurological effects (peripheral neuropathy), kidney failure, and respiratory

failure.

19.    Most cases of acute arsenic poisoning occur from accidental ingestion of

insecticides or pesticides and less commonly from attempted suicide.

20.    No acute health effects have been documented in the scientific literature from

arsenic exposure at the levels reported at KVSP between July 2010 and July 2012.

21.    Plaintiff did not ingest water at KVSP in anywhere near high enough

concentrations of arsenic to cause acute arsenic poisoning.

22.    To determine whether a chronic medical condition could have been caused by

arsenic exposure, experts look to the dosage (concentration of arsenic consumed), duration of exposure, and latency (duration of time between the first exposure and onset of the condition).

23.     Plaintiff does not meet the dosage, duration, or latency metrics to cause chronic arsenic poisoning.

24.     There are no reports in the scientific literature of joint, kidney, or organ pain, abnormal anxiety, psychological disorder, mental distress, or unnatural thoughts and feelings resulting from the level of exposure and duration of exposure experienced by Plaintiff.

25.     There are no reports in the scientific literature of dermatofibrosarcoma protuberans, or other cancers, resulting from the level of exposure, duration of exposure, and latency period experienced by Plaintiff.

26.     Plaintiff did not become ill from ingesting the arsenic in KVSP's water.

27.     No toxicologist has informed Plaintiff the water was dangerous.

28.     In 2008, after medical staff reported receiving injuries from inmates regarding KVSP's arsenic levels, KVSP's Chief Medical Executive (CME) Dr. S. Lopez, D.O. contacted the California Poison Control System, Fresno/Madera, to inquire as to the possible health concerns raised by the levels of arsenic detected in KVSP's water.

29.     Dr. R. Geller, M.D., M.P.H., from California Poison Control, responded to Dr. Lopez that there were zero expected health problems, acute or chronic, presented by arsenic at concentrations of 22 parts per billion, such as KVSP's water.

30.     Dr. Geller further stated that there was no need for other public health action.

31.     The process of installing an arsenic-removal plant at KVSP began in 2005. Construction on the arsenic-removal plant at KVSP began in October 2011, and continued until finished in December 2012. The project closed in January 2013.

32.     The California Department of Public Health approved CDCR's plan to install an arsenic-removal plant.

33.     The California Department of General Services had approval authority over the arsenic-removal contracting process and the California State Legislature had funding authority.

34.     When Cate became Secretary of CDCR, he was made aware that a solution was

5

already in progress to bring KVSP into regulatory compliance with the new arsenic standard.

Accordingly, Secretary Cate did not need to choose a different solution.

35.     Secretary Cate delegated responsibility and authority of the bidding, planning, design, and construction of the arsenic-removal plant to CDCR's Facility Planning, Construction, and Management Division.

36.     KVSP's plan used a coagulation/filtration process, which the EPA considers a best available technology.

37.     KVSP considered drilling new wells or installing point-of-use filters at the prison, but determined those alternatives were not viable because of cost, feasibility of correcting the issue, and because the water did not present a risk to inmate and staff health to necessitate them.

38.     CDCR also considered the possibility of connecting to the City of Delano's water system, which was working to build an arsenic-removal plant. It conducted an analysis and determined that a KVSP stand-alone plant was the best option.

39.     Secretary Cate was informed that KVSP's water did not pose a substantial risk of serious harm to inmates and staff. Secretary Cate never had any information, knowledge, or reason to believe that an alternative water source for all inmates and staff at KVSP was necessary while the arsenic-removal plant was being designed, planned, funded, and built.

40.     Secretary Cate was never informed that the level of arsenic in the drinking water at KVSP presented a serious risk of harm to Plaintiff, or anyone else.

41.     As the Acting Warden and Warden, Warden Biter did not have the personal authority to authorize a project the size of the arsenic-removal plant.

42.     When Warden Biter was made KVSP's Acting Warden, he understood CDCR had already determined that installing an arsenic-removal plant was the best way to bring KVSP's water into compliance with the MCL.

43.     Warden Biter consulted with CME Dr. Lopez regarding the drinking water and was informed that the levels did not present a health concern.

44.     Warden Biter was never informed that the levels of arsenic in KVSP's drinking water presented a danger to Plaintiff, or anyone else.

6

1    45.    Warden Biter was never informed by a qualified health official that an alternative

2  water source was necessary while the arsenic-removal plant was being designed and built.

3    46.    Warden Biter deferred to the expertise of KVSP plant operations staff on matters

4  regarding arsenic compliance. The staff working on the removal plant would report back to

5  Warden Biter regarding the progress of the planning, design, and installation of the plant.

6    47.    While KVSP was out of compliance with the new MCL, the California

7  Department of Public Health never ordered KVSP to stop providing water from its wells to staff

8  and inmates, never revoked KVSP's permit to provide water, and never ordered KVSP to provide

9  an alternative water source.

10    48.    Since completion of the KVSP arsenic-removal plant, KVSP has complied with

11  the MCL.

12  (Doc. 53-3 [UDF].)

13    **V.    JUDICIAL NOTICE**

14    Defendants request this Court take judicial notice of the CDCR Quarterly Status Report of

15  Capital Outlay Projects for the CDCR, Arsenic Removal Water Treatment System of March 31,

16  2013, and the State Water Resources Control Board, Division of Water Quality GAMA Program,

17  Groundwater Information Sheet, Arsenic of July 6, 2010. (Doc. 54.)

18    A court may take judicial notice of facts "not subject to reasonable dispute" because they

19  are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of

20  accurate and ready determination by resort to sources whose accuracy cannot reasonably be

21  questioned." Fed. R. Evid. 201.

22    Here, the CDCR Quarterly Status Report and State Water Resources Control Board

23  Groundwater Information Sheet are the type of facts the Court may take judicial notice of and

24  Defendants' request is granted. *See Corrie v. Caterpillar, Inc*., 503 F.3d 974, 978 n.2 (9th Cir.

25  2007) (explaining that a court may take judicial notice of a government publication); *Winnemem*

26  *Wintu Tribe v. U.S. Dep't of Interior*, 725 F. Supp. 2d 1119, 1131 (E.D. Cal. 2010) (a court may

27  take judicial notice of records and reports of administrative bodies*); Mobil Oil Corp. v. Tennessee*

28  *Val. Auth*., 387 F. Supp. 498, 500 n.1 (N.D. Ala. 1974) (taking judicial notice of Tennessee

1    Valley Authority reports).

2            **VI.    DISCUSSION**

3                    **A.  Summary Judgment Legal Standards**

4            Summary judgment is appropriate when it is demonstrated that there "is no genuine

5    dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

6    Civ. P. 56(a). A party asserting that a fact cannot be disputed must support the assertion by

7    "citing to particular parts of materials in the record, including depositions, documents,

8    electronically stored information, affidavits or declarations, stipulations (including those made for

9    purposes of the motion only), admissions, interrogatory answers, or other materials...." Fed. R.

10   Civ. P. 56(c)(1)(A).

11           Summary judgment should be entered, after adequate time for discovery and upon motion,

12   against a party who fails to make a showing sufficient to establish the existence of an element

13   essential to that party's case, and on which that party will bear the burden of proof at trial. *See*

14   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an

15   essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*.

16   If the moving party meets its initial responsibility, the burden then shifts to the opposing party to

17   establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec.*

18   *Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). In attempting to establish the

19   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

20   of their pleadings but is required to tender evidence of specific facts in the form of affidavits,

21   and/or admissible discovery material, in support of its contention that the dispute exists or shows

22   that the materials cited by the movant do not establish the absence of a genuine dispute. See Fed.

23   R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the

24   fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

25   governing law. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *T.W. Elec. Serv.,*

26   *Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The party must also

27   demonstrate that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

28   return a verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433,

1    1436 (9th Cir. 1987). In the endeavor to establish the existence of a factual dispute, the opposing

2    party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the

3    claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

4    versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary

5    judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

6    genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

7    committee's note on 1963 amendments).

8        In resolving the summary judgment motion, the evidence of the opposing party is to be

9    believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the

10   facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475

11   U.S. at 587. Inferences are not drawn out of the air and the opposing party must produce a factual

12   predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F.

13   Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to

14   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

15   some metaphysical doubt as to the material facts.... Where the record taken as a whole could not

16   lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

17   *Matsushita*, 475 U.S. at 587 (citation omitted).

18                    **B.  Legal Standards Concerning Conditions of Confinement Claims**

19        The Eighth Amendment protects prisoners from inhumane methods of punishment and

20   from inhumane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825 (1994); *Morgan v.*

21   *Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). No matter where they are housed, prison

22   officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing,

23   sanitation, medical care, and personal safety. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000)

24   (quotation marks & citations omitted). To establish a violation of the Eighth Amendment, the

25   prisoner must "show that the officials acted with deliberate indifference. . .." *Labatad v.*

26   *Corrections Corp. of America*, 714 F.3d 1155, 1160 (9th Cir. 2013) (citing *Gibson v. County of*

27   *Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002).

28        The deliberate indifference standard involves both an objective and a subjective prong.

1    First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Farmer*, 511

2    U.S. at 834. Second, subjectively, the prison official must "know of and disregard an excessive

3    risk to inmate health or safety." *Id*. at 837; *Anderson v. County of Kern*, 45 F.3d 1310, 1313 (9th

4    Cir. 1995).

5           Objectively, extreme deprivations are required to make out a conditions of confinement

6    claim and only those deprivations denying the minimal civilized measure of life's necessities are

7    sufficiently grave to form the basis of an Eighth Amendment violation. *Hudson v. McMillian*, 503

8    U.S. 1, 9 (1992). The Constitution "'does not mandate comfortable prisons.'" *Wilson v. Seiter*,

9    501 U.S. 294, 298 (1991) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). However,

10   "inmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges,

11   particularly over a lengthy course of time." *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir.

12   1989).

13          Subjectively, if an objective deprivation is shown, a plaintiff must show that prison

14   officials acted with a sufficiently culpable state of mind, that of "deliberate indifference." *Wilson*,

15   501 U.S. at 303; *Labatad*, 714 F.3d at 1160. "Deliberate indifference is a high legal standard."

16   *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir.2004). "Under this standard, the prison official

17   must not only 'be aware of the facts from which the inference could be drawn that a substantial

18   risk of serious harm exists,' but that person 'must also draw the inference.'" *Id*. at 1057 (quoting

19   *Farmer*, 511 U.S. at 837). "'If a prison official should have been aware of the risk, but was not,

20   then the official has not violated the Eighth Amendment, no matter how severe the risk.'" *Id.*

21   (quoting *Gibson*, 290 F.3d at 1188)). To prove knowledge of the risk, however, the prisoner may

22   rely on circumstantial evidence; in fact, the very obviousness of the risk may be sufficient to

23   establish knowledge. *Farmer*, 511 U.S. at 842; *Wallis v. Baldwin*, 70 F.3d 1074, 1077 (9th Cir.

24   1995).

25          The exposure to toxic substances can support a claim under section 1983. *See Wallis v.*

26   *Baldwin*, 70 F.3d 1074, 1076-77 (9th Cir. 1995) (exposure to asbestos). An Eighth Amendment

27   claim alleging a failure to provide clean or safe water is a conditions of confinement claim. *Reed*

28   *v. Harrington*, No. 1:11-CV-01883-AWI, 2013 WL 1627622, at *3 (E.D. Cal. Apr. 15, 2013)

1    (analyzing claim that prison water had levels of arsenic higher than EPA standards under a

2    conditions of confinement standard); *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001)

3    ("Poisoning the prison water supply or deliberately inducing cancer in a prisoner would be forms

4    of cruel and unusual punishment, and might be even if the harm was probabilistic or future rather

5    than certain and immediate"); *see also Helling v. McKinney*, 509 U.S. 25, 35-37 (1993) (using

6    "demonstrably unsafe drinking water" as a hypothetical example of a potential conditions of

7    confinement claim).

8                                    **C.  Analysis**

9            Defendants contend KVSP's water was safe, the arsenic levels in KVSP's water were not

10   ignored and Plaintiff suffered no harm. As a result, Defendants assert Plaintiff has failed to

11   demonstrate the required elements of his conditions of confinement claims against Defendants

12   Cate and Biter.

13                    Plaintiff Fails to Prove the Objective Element of His Eighth Amendment Claim

14           Defendants have presented evidence that KVSP's water did not present an objectively

15   serious risk of harm. In 2001, the EPA updated its maximum contamination level (MCL) to 0.010

16   milligrams per liter (mg/L) (or 10 micrograms per liter [mcg/L] or 10 parts per billion) of arsenic.

17   (UDF 5.) The State of California adopted the EPA's arsenic MCL standard in November 2008.

18   (UDF 7.) Arsenic is one of many trace elements found in abundance occurring naturally in the

19   environment. (Doc. 53-10, ¶ 14.) Between July 2010 and July 2012, KVSP's arsenic level was

20   less than half the former MCL, with quarterly averages for its two wells between approximately

21   0.014 mg/L and 0.020 mg/L. (UDF 10.) This was substantially under the prior EPA and

22   California maximum contaminant level of 0.050 mg/L. (UDF 5, 7, 10.)

23           Notices were posted quarterly stating that the amount of arsenic in KVSP's water did not

24   present an emergency. (UDF 11-12.) The notices also informed inmates that they did not need to

25   use an alternative water source. (UDF 13.)  During the period KVSP was out of the compliance

26   with the modified MCL, the California Department of Public Health did not order KVSP to stop

27   providing water from its wells to staff and inmates, did not revoke KVSP's permit to provide

28   water, and never ordered KVSP to provide an alternative water source. (UDF 47.) Following

11

1    completion of the arsenic-removal plant, KVSP has complied with the applicable MCL. (UDF

2    48.)

3        Plaintiff also fails to demonstrate that the risk of arsenic exposure was "so grave that it

4    violate[d] contemporary standards of decency to expose anyone unwilling to such risk." *Helling*,

5    509 U.S. at 36. The risk cannot be one that "today's society chooses to tolerate." *Id*. As of July 6,

6    2010, when Plaintiff was at KVSP, approximately 1,375 of 10,425 wells sampled in California

7    had MCL concentrations above the MCL. Kern County, where KVSP is located, was one of the

8    counties with the most wells out of compliance. (UDF 8.)

9        Additionally, no acute health effects have been documented in the scientific literature

10   from arsenic exposure at the levels reported at KVSP between July 2010 and July 2012. (UDF

11   20.) Plaintiff's consumption of water at KVSP did not involve high enough concentrations of

12   arsenic to cause acute arsenic poisoning. (UDF 21.) Nor does Plaintiff meet the dosage, duration,

13   or latency metrics to cause chronic arsenic poisoning. (UDF 22-23.) There are no reports in the

14   scientific literature of joint, kidney, or organ pain, abnormal anxiety, psychological disorder,

15   mental distress, or unnatural thoughts and feeling. (UDF 24.) Nor are there any reports of

16   dermatofibrosarcoma protuberans or other cancers resulting from the level and duration of

17   Plaintiff's exposure and the latency period he experienced. (UDF 25.) Finally, Plaintiff was never

18   informed by a toxicologist that the water he consumed was dangerous. (UDF 27.)

19       With respect to Plaintiff's medical condition, Plaintiff admitted during his deposition that

20   no toxicologist had informed him the water at KVSP was dangerous. (UDF 27.) Moreover, Dr. T.

21   Durrani, a board certified physician in family medicine, general preventative medicine and public

22   health, occupational medicine, and medical toxicology, and Associate Chief of Clinical Services

23   in the Division of Occupational, Environmental and Climate Medicine at the University of

24   California San Francisco, Medical Director of Occupational Health Services at San Francisco

25   General Hospital, Assistant Medical Director for the California Poison Control System, San

26   Francisco Division, and Attending Physician for the Medical Toxicology Inpatient Service of San

27   Francisco General Hospital and Trauma Center, reviewed Plaintiff's complaint, deposition

28   transcript, and medical records maintained by the CDCR, and KVSP's quarterly drinking water

1    notices from July 2010 to July 2012. (Doc. 53-10, ¶¶ 1-2, 7.) Based upon his professional training

2    and experience, review and understanding of texts and articles in peer-reviewed medical literature

3    concerning arsenic, and his review of Plaintiff's medical records, Dr. Durrani opined that

4    Plaintiff's belief that he suffers or will suffer any adverse health effects from drinking water at

5    KVSP is mistaken. (*Id*., ¶ 31.) Dr. Durrani states there is no evidence that Plaintiff was exposed to

6    arsenic in KVSP's drinking water in sufficient amounts over a sufficient length of time to cause

7    any harm to Plaintiff's health. (*Id*.) Dr. Durrani further states there is no clinical evidence based

8    on authoritative research in the area of arsenic poisoning that consuming arsenic in the

9    concentration consumed by Plaintiff for the relevant period would result in the conditions alleged

10   by Plaintiff or in any other harm. (*Id*.)

11         The Court finds that Defendants have met their burden on summary judgment by

12   producing evidence that drinking water containing arsenic in concentrations of less than 0.050

13   mg/L is safe to consume, and there is no evidence to demonstrate that drinking water with an

14   arsenic concentration of 0.022 mg/L, like KVSP's water, posed a risk to Plaintiff's health. There

15   is also no link to any medical consequences that Plaintiff suffered as a result of the arsenic levels

16   at KVSP. Plaintiff has failed to rebut Defendants' evidence concerning the objective element of

17   his conditions of confinement claims. *Celotex*, 477 U.S. at 322; *Matsushita*, 475 U.S. at 586,

18   n.11.

19                    Plaintiff Fails to Prove the Subjective Element of His Eighth Amendment Claim

20         "Deliberate indifference is a high legal standard." *Toguchi*, 391 F.3d at 1060. It requires a

21   "sufficiently culpable state of mind." *Hearns v. Terhune*, 431 F.3d at 1040. Defendants are only

22   liable if they knew of an excessive risk of harm and disregarded the risk. *Farmer*, 511 U.S. at

23   838. A defendant must be "aware of facts from which the inference could be drawn that a

24   substantial risk of serious harm exists, and [the defendant] must [] draw the inference." *Id*. If the

25   defendant did not know about the risk, he or she did not inflict the injury. *Id*.

26         It is undisputed that when he became Secretary of CDCR, Defendant Cate was made

27   aware that a solution to the arsenic levels in KVSP's water was already in progress to ensure

28   KVSP would become compliant with the modified arsenic standard. (UDF 34.) As a result, Cate

                                                      13

1    did not choose a different solution. (UDF 34.) Cate delegated responsibility and authority for the

2    arsenic-removal plant to the Facility Planning, Construction, and Management Division, whose

3    plan was approved by the California Department of Public Health. (UDF 32, 35-38.) Cate was

4    informed that KVSP's water did not pose a substantial risk of serious harm to inmates or staff.

5    (UDF 39-40.) Cate had no knowledge, information, or reason to believe that an alternative water

6    source for all inmates and staff at KVSP was necessary. (UDF 39.)

7         It is also undisputed that when he became Acting Warden at KVSP, Defendant Biter

8    understood CDCR had already determined that installing an arsenic-removal plant was the best

9    way to bring KVSP's water into compliance with the MCL. (UDF 42.) Biter was informed by

10   CME Lopez that the levels of arsenic in KVSP's drinking water did not present a health concern.

11   (UDF 43.) Biter was never informed the levels of arsenic presented a danger to Plaintiff or any

12   other person, nor was he ever informed an alternative water source was necessary. (UDF 44-45.)

13        The evidence presented demonstrates that KVSP officials did not ignore the arsenic levels

14   in the water consumed by inmates and staff at KVSP. They instead investigated and made

15   reasonable attempts to resolve the issue. Defendant Cate delegated responsibility and authority for

16   the construction of an arsenic-removal plant at KVSP. (UDF 32.) Defendant Biter and his staff

17   provided monthly water tests to the California Department of Public Health, posted quarterly

18   notices required by the California Department of Health regarding the arsenic levels, and

19   provided consumer confidence reports. (UDF 11-16.) Defendant Biter was not directly involved

20   in the construction of the arsenic removal plant, and he generally deferred to the expertise of

21   KVSP and correctional staff who would report back to him regarding the progress of the

22   planning, design, and installation of the plant. (UDF 41, 46.) During the design phase for the

23   arsenic-removal plant, the CDCR reviewed other arsenic-removal techniques to determine the

24   type of facility that would be best for KVSP, including drilling new wells or installing point-of-

25   use filters, and connecting to the City of Delano's water system, but these alternatives were not

26   feasible given the appropriate considerations. (UDF 36-38.)

27        The evidence also supports the finding that Defendants Cate and Biter were not aware of

28   any serious risk of harm. *Farmer*, 511 U.S. at 838. Defendant Cate was advised that KVSP's

1   water did not pose a substantial risk of serious harm to inmates or staff, including Plaintiff, and

2   was never informed that an alternative water source was necessary. (UDF 39-40.) Defendant Biter

3   was similarly advised and consulted with KVSP's CME, who informed Biter that the water was

4   not dangerous. (UDF 43-45.) The quarterly notices that were posted indicated the arsenic levels at

5   KVSP did not present an emergency and there was no need to use an alternative water source.

6   (UDF 12-13.) Ultimately, neither Cate nor Biter was ever informed that the water was dangerous

7   or that they should provide an alternative source of water to prevent KVSP's inmates and staff

8   from being harmed. Therefore, based on the evidence presented, neither Defendant Cate nor

9   Defendant Biter was aware that KVSP's water presented a risk to Plaintiff and summary

10  judgment in their favor is appropriate.[3]

11           **VII.    CONCLUSION AND RECOMMENDATION**

12          Based on the foregoing, it is **HEREBY RECOMMENDED** that Defendants' motion for

13  summary judgment (Doc. 53) be **GRANTED**.

14          These Findings and Recommendations will be submitted to the United States District

15  Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  **Within 14 days**

16  after being served with a copy of these Findings and Recommendations, a party may file written

17  objections with the Court. Local Rule 304(b). The document should be captioned, "Objections to

18  Magistrate Judge's Findings and Recommendations" and **shall not exceed fifteen (15) pages**

19  without leave of Court and good cause shown. The Court will not consider exhibits attached to

20  the Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference

21  the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise

22  reference the exhibit with specificity. Any pages filed in excess of the fifteen (15) page limitation

23  may be disregarded by the District Judge when reviewing these Findings and Recommendations

24  under 28 U.S.C. § 636(b)(l)(C). A party's failure to file any objections within the specified time

25

26

27  [3] Because the Court has found that Defendants are entitled to judgment on the merits, the Court does not reach Defendants' alternative argument that they are entitled to qualified immunity.

28

15

1    may result in the waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839

2    (9th Cir. 2014).

3

4    IT IS SO ORDERED.

5    Dated:  __**December 2, 2024**__                    /s/ *Sheila K. Oberto*

6                                                        UNITED STATES MAGISTRATE JUDGE

16